IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| **MELINDA G. THOMPSON,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action Number |
| ) | **3:08-cv-742-UWC** |
| **JO ANNE B. BARNHART,** ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA").  This Court finds the Administrative Law Judge's ("ALJ") decision, which has become the decision of the Commissioner, is not supported by substantial evidence.  Therefore, for the reasons elaborated herein, the Court will **REVERSE** and **REMAND** the decision denying benefits.

**I.  Procedural History**

Plaintiff filed an application for supplemental security disability in May 2006, alleging an onset date of May 23, 2006.  (R. 13, 254.)[1]  This application was denied

---

[1] Plaintiff previously filed an application for benefits in January 2005, and she received an unfavorable decision in March 2005.  The ALJ noted, at the hearing on this most recent application, that there is no reason to open or revise that first application.  (R. 254.)

1

administratively at the initial and reconsideration stages.  Plaintiff requested a hearing before an ALJ, which was held on October 30, 2007, in Decatur, Alabama.  (R. 254.)  On December 10, 2007, the ALJ denied the claim. (R. 19.)  This denial became the final decision of the Commissioner of the SSA when the Appeals Council refused to grant review on February 21, 2008.  (R. 5.)  Having timely pursued and exhausted her administrative remedies, Plaintiff filed an action for judicial review in Federal District Court pursuant to section 1631 of the Social Security Act, 42 U.S.C. § 1383(c)(3).

## II.  Factual Background

At the time of the hearing, Plaintiff was a 32 year-old woman who did not complete eleventh grade.  (R. 109, 254, 259, 272.)  Plaintiff attended GED courses, but testified that she could not understand the material.  (R. 259.)  According to Plaintiff, she reads at a fourth or fifth grade level and she attended special education courses starting in second or third grade.  (R. 260, 272.)  Plaintiff has past relevant work experience as an apartment cleaner, cell phone store cashier and movie rental clerk.  (R. 118-22.)  She has not engaged in substantial gainful activity since on or about May 23, 2006.  (R. 15.)  She suffers from back pain, that sometimes radiates down her leg, obesity and borderline intellectual functioning.

### A. Back and Lower Extremity Pain

In June 2004, Plaintiff was injured at Movie Gallery where she was employed.  She was sitting in a chair that was apparently broken.  At some point, she attempted to

"scoot back" in the chair and fell onto her tail bone. (*See* R. 142.) She was initially diagnosed with lumbar strain and was unable to return to work. (R. 138.)

She began physical therapy on July 6, 2004, at which time she complained of constant pain aggravated by sitting and bending over. She also complained that the pain interfered with her sleep. (R. 147.) On July 13, 2004, she was treated by Dr. Jay R. Solorio, an orthopaedist. Although her lower extremity strength was 5/5, she had tenderness and pain, with diminished sensation. Her x-rays revealed loss of lumbar lordosis, but otherwise her x-rays were normal. Dr. Solorio prescribed pain killers, muscle relaxers and continued physical therapy. (R. 184, 177-78.)

One week later when she returned to physical therapy, Plaintiff reported increased severity of pain. (R. 148.) Within the week, she had three more physical therapy sessions, during which she reported her pain decreased some, but then increased again. (R. 148-49.)

Plaintiff returned to Dr. Solorio on August 2, 2004, at which time she reported sharp lower back pains, along with lower extremity pain. She also reported her pain was worsening. Upon examination there was tenderness in her back. (R. 181-82.) When she went to physical therapy that same day she reported she had not done her exercises due to pain. (R. 149.) Two days later, she felt "some better" during physical therapy, but omitted the pelvic tilt due to pain and had difficulty with partial sit-ups. (R. 149.) Several days later, she was voicing new complaints of pain and on August 10, she

complained of a lot of pain. (R. 149.) The following day she complained of pain due to an MRI and the physical therapist noted muscle spasms. (R. 150.) The next day, August 12, she reported feeling "some better" than she had after the MRI. (R. 150.) By August 16, she was not really feeling any better. (R. 150.)

Approximately one month later, in September 2004, she returned to Dr. Solorio and reported worsening pain. Upon examination he noted spine and sciatic notch tenderness. His records also indicate that her MRI results showed mild degenerative disc disease at L4-L5 and L5-S1. (R. 174.)

In January 2005, she returned to Dr. Solorio complaining of sharp pain and the inability to bend or sleep. Dr. Solorio noted tenderness in her spine and diminished sensation. He referred Plaintiff to a pain clinic. (R 168-69.)

On February 7, Plaintiff was treated by Dr. Charles H. Clark of Neurosurgical Associates. His notes indicate epidural blocks with no lasting relief and current medications including Lorcet Plus. He noted she was in no acute distress. He opined she probably had degenerative disc disease and started her on Robaxin (a sedative with muscle relaxant properties). (R. 165.) In a letter to Dr. Solorio, Dr. Clark noted Plaintiff's MRI showed mild desiccation of the L4/L5 and L5/S1 discs, but no evidence of stenosis or nerve root encroachment. He was of the opinion that she did not have a surgical problem and he recommended she return to light duty work for one month, then full duty after that. (R. 164.)

The following month, March 2005, Plaintiff was examined by the SSA's consulting family practice physician: Will R. Crouch. (R. 166-67.) Plaintiff reported no relief after epidurals in November and in December. Dr. Crouch noted Plaintiff appeared uncomfortable sitting on the examination table, she changed positions several times and ambulated with a limp. He also noted tenderness to palpitation over the lower lumbar paraspinous muscles, positive straight leg raise on the left to 40 degrees, negative on the right. She could not squat or rise, but could perform the heel toe walk. Additionally, her range of motion was somewhat limited. He diagnosed chronic low back pain, rule out herniated disc. However, he did not give an opinion about her ability to work.

Four months later on July 15, 2005, Plaintiff was treated in the emergency room for lower back pain. The records indicate she was ambulating with difficulty. (R. 190-92.) Approximately one month later she returned to Dr. Solorio, who again noted tenderness in her spine and diminished sensation. He prescribed Lorcet Plus. (R. 169.) One week later she complained of sharp pain and weakness on her left side after picking up a table at work. She had lumber and sciatic notch tenderness. He referred her to a different spine surgeon. (R. 170-71.)

On January 6, 2006, she was treated by pain specialist Dr. Morris L. Scherlis. (R. 203-5.) Plaintiff reported she felt like she is being stuck with pins and needles. She also reported pain radiating down her left leg to her foot. She had a burning sensation in her tail bone with occasionally spasms. Although sleeping pills occasionally provided some

relief, she generally had trouble sleeping. Only one of her past three epidurals had provided any relief. However, the relief was short-lived: she felt better for only two weeks. She rated her pain at 7 out of 10 and noted Lortab did not provide relief. He noted she moved all of her extremities well, but she showed facial grimaces when changing body positions from seated to standing and vice-versa. She had obvious lumbar tenderness to palpitation and left sacroliac joint tenderness to palpitation. He recommended contacting workers compensation for approval of additional injections. He opined that she might have two problems: radicular nerve pain and face joint tenderness.

On March 1, he reported that the last injection did help for several weeks; she had another injection that day. (R. 200.) She returned for an injection on May 1, at which time she reported the previous injection had helped. (R. 197.) Two months later, in July 2006, she reported she had been doing well for close to three months between procedures. She had another injection that same day, July 5, 2006. (R. 245-47.)

On October 6, she returned for another injection. At this time she reported that she had done very well since the last injection. However, she did have several weeks of muscle spasms after bending over, but this problem cleared up very well. She noted the injections helped tremendously. (R. 241-42.)

She returned for a clinical visit four days later and reported intense pain since the previous October 6 injection. She rated her pain at 4/10 with most of the pain in her low back extending up her spine to her neck. She also complained of dizziness and sleepiness

after the procedure.  Dr. Scherlis did note she had some "orthostatic hypotension [2] with

her blood pressure being 162/86 sitting and 143/84 standing.  It is noted that her heart rate

changes as well from 72 while seated to 85 while standing."  (R. 243-44.)

On January 9, 2007, Plaintiff returned for another epidural.  She reported that she

had done very well after the last procedure.  She noticed deceased pain by 50%, as well as

increased mobility and activities.  "Unfortunately she had a house fire in December and

states that since then she had really pushed herself and the pain once again has gotten

severe."  (R. 238.)

Upon her return in April for another injection, she indicated that the last procedure

had helped some.  She was doing reasonably well, but asked for her medications to be

increased.  However, Dr. Scherlis was reluctant to prescribe them.  Most of her pain was

once again over the lumbar facets and sacroiliac joints.  She reported that the epidurals

helped 50% for 2 ½ months or so.  (R. 235.)

When Plaintiff returned three months later, in July 2007, she reported that the pain

had dissipated until approximately 1½ weeks ago when she started having decreased

discomfort caused be a lot of pushing and pulling.  She reported that she had recently

moved into a new home.  "Either way she states she is overall very pleased with her pain

relief and pain control.  As I told her, I certainly wasn't curing her but we were managing

---

[2] Orthostatic hypotension occurs where there is a sudden fall in blood pressure when standing.

her pain and she understand that and is very happy." Dr. Scherlis noted tenderness again in the bilateral facets and sacroiliac joints on palpation. (R. 232.)

## B. Psychological Consultation

On August 4, 2006, Plaintiff was examined by Dr. John R. Haney, Ph.D. He noted Plaintiff appeared somewhat sad. However, she was cooperative. He also noted she walked with noticeable effort and pain. During her psychological testing she worked at a slow pace, sometime requiring encouragement and repetition for the test items. After the test, he noted that Plaintiff was oriented to time, place, person and situation. She was unable to subtract serial sevens, but could count forward by threes. However, she had difficulty calculating change and she could only remember three out of five items after five minutes.

He noted that most of her subtest scores were significantly below average and he found she possessed no particular strengthens. On her IQ test, Plaintiff scored Full Scale 71, Verbal 69 and Performance 78. He concluded she suffered from pain disorder with both psychological factors and general medical condition. He also found she had borderline intellectual functioning. He opined that Plaintiff's "ability to function in most work appeared moderately impaired due the patient's physical and vocational training limits." Finally, he regarded her statements during the session as truthful. (R. 206-7.)

### C. Administrative Proceedings

At the administrative hearing, Plaintiff testified that she reads at the third or fourth grade level, is only able to do simple arithmetic if she uses her fingers and was unable to complete the GED course because she could not comprehend the material presented in the class. (R. 256, 259-60, 272-73.) When tested by the ALJ, she made three attempts before correctly calculating change when given a dollar for a 35 cent item. (R. 260, 272.) She explained that her medications get her "messed up" and noted that, in her past job as a cashier, the cash register calculated the proper change. (R. 260, 272.)

Plaintiff testified that she applied for a job as a cashier, prior to filing her SSA application, but was unable to obtain employment because of her back injury and inability to lift anything over 5 pounds. (R. 262.)

Regarding her pain, she testified that her legs go numb and she has chronic pain radiating down her left leg. (R. 266, 279, 281, 289.) She reported that she can sit for only thirty minutes at a time on a "good day," she can walk approximately one half block and stand for approximately ten minutes. (R. 281.) Because of her condition, she gets depressed because she cannot engage in activities of her past. (R. 266, 269.)

Plaintiff testified that her medications help for a couple of weeks, then she must rely on her pain pills and muscle relaxers. (R. 276, 287-88.) Her medications include Skelaxin and Ultracet which make her drowsy and give her headaches. (R. 279, 288-89; *see* R. 135.) Plaintiff testified that after she was released to return to work she either was

9

fired or had to quit because her boss would not allow her several days off work to recover after her epidurals.  According to Plaintiff, she needs 3 - 4 days to recover after the injections.  (R. 261, 267.)

After the administrative hearing, the ALJ found that Plaintiff suffers from severe impairments of obesity, borderline intellectual functioning and pain disorder, but that the impairments do not meet or equal a listing. (R. 15.) The ALJ further found that Plaintiff could perform light work with a sit/stand option, alternating positions at will as needed for 8 hours per day with customary breaks and with the ability to lift 5-10 pounds frequently and 20 pounds occasionally.  (R. 15-16.)  The ALJ discredited the IQ test performed by Dr. Haney due to Plaintiff's work history and reported daily activities.  (R. 17-18.)  The ALJ also discredited Plaintiff's testimony that she needed three to four days to recover after her epidurals.

### III.  Controlling Legal Principles

A disability claimant has a heavy, but not insuperable, burden to establish entitlement to benefits.  *Mims v. Califano*, 581 F.2d 1211, 1213 (5th Cir. 1978).  The district court's standard or scope of review is limited to determining whether the substantial evidence support's the Commissioner's decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  Additionally, the Court must determine whether proper legal standards were applied.  *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997) (citing *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987)).

Substantial evidence is more than a scintilla, but less than a preponderance. It is such evidence a reasonable mind would accept as adequate to support a conclusion. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). In contrast, the Commissioner's legal conclusions are more closely scrutinized. "The [Commissioner's] failure to apply the correct law or to provide the reviewing Court with the sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 969 F.2d 1143, 1145-45 (11th Cir. 1991).

Applicable agency regulations require a sequential evaluation of adult disability claims. 20 C.F.R. § 404.1520 (1983). The first consideration is whether the claimant is working. If the claimant is working, she is not disabled. If the claimant is not working, the Commissioner must determine whether the claimant suffers from a severe impairment. If the claimant does not suffer from a severe impairment, she is not disabled. If the claimant suffers from a severe impairment, then the Commissioner must consider whether the claimant meets any of the listings in 20 C.F.R. pt 404, subpt P, app. 1 ("Listing"), which details "impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. § 404.1520(a). *See Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985). If the claimant's medical profile meets the criteria for an impairment in the "Listing," then the claimant is disabled by law and no further inquiry is necessary.

The burden is on the claimant to show that she meets the criteria under the listing. To meet the listing, the claimant must be (1) diagnosed with a condition that is listed or its equivalent, and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and duration requirement. *See Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).

When a claimant's "severe" impairment does not fall within a Listing, but nonetheless restricts her ability to perform basic work activities, the ALJ must then assess the claimant's residual functional capacity and the range of work activities that the claimant could perform despite his impairments.  This evaluation must give consideration to claimant's subjective complaints, accounting for nature of pain, medication, treatment, functional restrictions, claimant's daily activities, and other relevant factors.  20 C.F.R. § 404.1512.

Additionally, pursuant to 20 C.F.R. § 404.1523, the ALJ is required to consider the disabling effect of multiple impairments:

> In determining whether your physical or mental impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all your impairments without regard to whether any such impairments if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medially severe combination of impairments, we will determine that you are not disabled.

Pain alone can be disabling.  When a claimant claims disability based solely on

pain, a three-part standard is utilized in assessing the credibility of his testimony. The claimant must establish evidence of an underlying impairment <u>and</u> either: (1) objective medical evidence to confirm the severity of pain alleged, or (2) a finding that the impairment is of such a severity that it can be reasonably expected to cause the pain alleged. *See, e.g.*, *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992) (emphasis added).

## IV. Analysis

This Court must reverse the Commissioner's decision because the SSA ignored substantial evidence and failed to give proper credit to the testimony of Dr. Haney.

With respect to Plaintiff's back/leg pain, the records indicate that Plaintiff continues to require injections, pain relaxers and narcotic medications to manage her pain. While she does enjoy some temporary relief after her injections, even relatively minor physical activity aggravates her condition. For example, after one injection she initially improved, but later experienced several weeks of muscle spasms after bending over. Additionally, even with the injections, muscle relaxers, and narcotic medications, her treating pain management physician always notes tenderness upon examination. Moreover, her medications make her sleepy and give her headaches. Thus, even when she reported her pain was at level 4/10 (just a few days after an injection), she was still under the influence of her medications which caused serious side-effects.

Finally, with respect to her pain and her course of treatment, the SSA ignored

substantial evidence about Plaintiff's condition three to four days after her epidurals. The records clearly establish unusual findings four days after an epidural injection: Plaintiff's pain management physician, Dr. Scherlis, noted that Plaintiff had some "orthostatic hypotension [3] with her blood pressure being 162/86 sitting and 143/84 standing. It is noted that her heart rate changes as well from 72 while seated to 85 while standing." (R. 243-44.) The Court notes that records from Dr. Scherlis repeatedly indicate explanations to Plaintiff that the injections can cause myriad side effects.

Accordingly, the SSA ignored substantial evidence that Plaintiff had an underlying impairment, along with some objective evidence to confirm the severity of pain alleged, as well as evidence that Plaintiff's pain is of such a severity that it can be reasonably expected to cause the pain alleged. *See Landry v. Heckler*, 782 F.2d at 1553.

With respect to her mental functioning, the SSA ignored substantial evidence that Plaintiff meets the listing 12.05 for Mental Retardation which requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e. the evidence demonstrates or supports onset of the impairment before age 22," along with a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or functioning."

---

[3] Orthostatic hypotension occurs where there is a sudden fall in blood pressure when standing.

Plaintiff clearly had scores within the mandated range.  Inasmuch as Dr. Haney noted he found Plaintiff's statements to be truthful and he did not note any attempts by Plaintiff to intentionally obtain low scores, the SSA was not free to ignore Plaintiff's IQ test scores.  Indeed, Dr. Haney's findings that most of Plaintiff's subtest scores were significantly below average and she possessed no particular strengtens, were consistent with her low overall scores.  Additionally, there was evidence that Plaintiff attended special education courses and she was unable to understand the material in her GED courses.  Although Plaintiff engaged in past work activity, her spotty work record evidences problems with "adaptive functioning."  In addition to Plaintiff's low IQ scores, her back pain, medication side-effects and her obesity "impos[e] . . . additional and significant work-related limitation or functioning."  *See id*.

In other words, SSA ignored substantial evidence regarding the combined effects of Plaintiff's severe impairments.

Therefore, by separate order, the decision denying benefits will be **REVERSED** and the appropriate relief will be granted.

DONE this 31st day of December, 2008.

_____
U.W. Clemon
United States District Judge